IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FELICIA DIXON,                    )
AIS #131933,                      )
                                  )
        Plaintiff,                )
                                  )
        v.                        )        CASE NO. 2:08-CV-745-WC
                                  )             [WO]
                                  )
JAMES SUTTON, et al.,             )
                                  )
        Defendants.               )

# MEMORANDUM OPINION

## I.  INTRODUCTION

In this 42 U.S.C. § 1983 action, Felicia Dixon ["Dixon"], a state inmate, challenges the constitutionality of an alleged sexual encounter which occurred during her incarceration at the Julia Tutwiler Prison for Women ["Tutwiler"].  The complaint lists James Sutton, a licensed practical nurse previously employed at Tutwiler, Correctional Medical Services, Inc. ["CMS"], the medical care provider for the Alabama Department of Corrections, Everest Indemnity Insurance Company ["Everest"], the liability insurance carrier for CMS and its employees, and Richard Allen, the Commissioner of the Alabama Department of Corrections at the time the claim arose, as defendants in this cause of action.  Specifically, Dixon complains that on a night in June of 2008 defendant Sutton "pulled out his penis and ordered [her] to perform oral sex on him....  I complied with his order, and put James

Sutton penis in my mouth [for a minute or so]." *Plaintiff's Complaint - Court Doc. No. 1* at

3. Dixon maintains this act constituted cruel and unusual punishment under the Eighth

Amendment and denied her equal protection and due process. Dixon also contends

defendants Allen and CMS should be held liable to her for the actions of Sutton because

he was employed as a nurse for CMS under a contract to provide medical services within

the prison system. In addition, Dixon maintains CMS acted with deliberate indifference

to her safety in hiring, training, monitoring and supervising nurse Sutton. Finally, Dixon

seeks to invoke the supplemental jurisdiction of this court with respect to tort claims of

negligence and assault/battery against the defendants. Dixon requests declaratory relief

and monetary damages for the alleged violations of her constitutional rights and state tort

law. Dixon demands a trial by jury.

The defendants filed special reports and supporting evidentiary materials addressing

each of Dixon's claims for relief. Pursuant to the orders entered in this case, the court

deems it appropriate to treat the special reports as motions for summary judgment. *Order

of May 12, 2009 - Court Doc. No. 68*. Thus, this case is now pending on the defendants'

motions for summary judgment. Upon consideration of these motions, the evidentiary

materials filed in support thereof, and the plaintiff's multiple responses in opposition to the

defendants' reports/motions, the court concludes that: (i) The motions for summary

judgment filed by defendants Allen, CMS and Everest are due to be granted; while (ii) The

motion for summary judgment filed by defendant Sutton is due to be granted in part and denied in part.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the

---

[1] Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination." *Id*. "'Shall' is also restored to express the direction to grant summary judgment." *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

When the defendants meet their evidentiary burden and demonstrate the absence of any genuine dispute of material fact, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists.  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.")  A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor.  *Greenberg*, 498 F.3d at 1263.

In civil actions filed by inmates, federal courts

must distinguish between evidence of disputed facts and disputed matters of professional judgment.  In respect to the latter, our inferences must accord deference to the views of prison authorities.  Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted).  Consequently, to survive the defendants' properly supported motions for

summary judgment, Dixon is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting her claims of constitutional violations. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Hence, when a plaintiff fails to set forth

specific facts supported by requisite evidence sufficient to establish the existence of an element essential to her case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted). To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some

metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine dispute of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings and evidentiary materials before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish genuine dispute of material fact, nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his/her favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact.  *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case.  In this case, Dixon has demonstrated a genuine dispute of material fact in order to preclude entry of summary judgment on her sexual abuse and state tort claims against

defendant Sutton.  Defendants CMS, Allen and Everest, however, are entitled to summary judgment on all of the claims lodged against them by Dixon.

### III.  DISCUSSION

### A.  Facts

At this stage of the proceedings, the court must "take the facts alleged in the complaint as true and construe them in the light most favorable to [Dixon].  *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008)."  *Danley v. Allen*, 540 F.3d 1298, 1304 (11th Cir. 2008).  In accordance with this directive, the facts are that in June of 2008, defendant Sutton approached Dixon and ordered her to perform oral sex on him.  *Plaintiff's Complaint - Court Doc. No. 1* at 3 (Sutton motioned for Dixon to enter the shower area and sit on a bench.  Sutton then unzipped "his pants, pulled out his penis and ordered [Dixon] to perform oral sex on him....  [Dixon hesitated and Sutton] said 'you are wasting time. Just do it a [little] bit.  He put his penis to my lips and said, 'Sh-- you owe me [for allowing you to use the phone and bringing you free-world food], now come on open your mouth, just a little bit.'  I complied with his order, and put James Sutton penis in my mouth.").  In response to Sutton's argument she consented to the sexual act, Dixon asserts she was compelled to perform the act because Sutton ordered her to do so and due to her status as an inmate Sutton maintained a position of authority over her.  *Plaintiff's July 9, 2009 Response - Court Doc. No. 73* at 7 ("Sutton forced [me to perform oral sex] by his order, verbal command....  Plaintiff is a state prisoner, controlled by verbal command and order

[who acted under duress which extinguishes any implied consent by Dixon].... [It] is ridiculous [t]o say Plaintiff admits her alleged encounter with Sutton was consensual. She reported this [sexual abuse by Sutton] in order to [stop further abuse and to] do this she told what she was forced to do. Do not think Plaintiff wants to be at the command of repetitious penis sucking."); *Plaintiff's November 6, 2008 Response - Court Doc. No. 29* at 2 ("James Sutton ... forced 'Dixon' to suck his penis....").

Dixon reported this incident to a correctional officer at Tutwiler on July 25, 2008 and correctional officials, with the cooperation and assistance of Dixon, immediately began an investigation into the allegations presented to them. Specifically, Dixon "reported the sexual assault ... by defendant Sutton to ... Captain Hawthorne.... [P]laintiff [then] spoke to Internal Investigations (I&I) Mr. Barfoot and gave a statement." *Plaintiff's Amendment to the Complaint - Court Doc. No. 31* at 5. On August 11, 2008, correctional officials placed an electronic recording device on the plaintiff in an attempt to "obtain a conversation with James Sutton to obtain evidence. [The following day,] Plaintiff was taken to the I & I [central] office to take a polygraph. On or about August 13, 2008 Plaintiff Dixon was transferred from Tutwiler to Montgomery Women's Facility [and subsequently referred] to the office of I & I for another polygraph." *Id*. at 5-6. Sutton did not have access to Dixon during her incarceration at the Montgomery Women's Facility.

On the morning of August 13, 2008, Frank Albright, the warden of Tutwiler, met with Colleen Oakes, the director of nursing for Tutwiler, and advised Oakes he had

9

received a complaint from an inmate against nurse Sutton.  In describing her meeting with

warden Albright, Ms. Oakes stated that:

> ... Warden Albright notified me that he had received a complaint from an inmate against a CMS employee, which he only described as a "sexual harassment complaint."  Warden Albright stated that he could not be anymore specific regarding the nature or extent of the complaints, but he did identify Mr. Sutton as the CMS employee who was the subject of the complaint.  Warden Albright requested information regarding Mr. Sutton's work schedule and requested that I obtain the necessary approvals from CMS in order to disclose this information to him.  At the conclusion of our conversation, Warden Albright stated that this matter was the subject of a pending investigation by the Intelligence and Investigations Division ("I&I") of the Alabama Department of Corrections and he instructed me that I was not authorized to disclose any information regarding the inmate complaint to anyone.  I specifically informed Warden Albright that I was obliged to notify my supervisor, Rainbow Cross, as well as persons in the Legal Department with CMS ..., which Warden Albright approved but remained insistent that I not notify anyone or take any affirmative steps of any kind regarding these complaints.  Warden Albright made it very clear to me that there was to be no action taken with regard to Mr. Sutton as there was a pending I&I investigation and there were to be no discussions between myself and Mr. Sutton regarding the nature of the Complaint.
>
> During the course of my August 13, 2008, conversation with Warden Albright, I specifically asked Warden Albright whether Mr. Sutton should be immediately removed from the facility as a precautionary step to limit his presence around the inmate population at Tutwiler.  At that time, Warden Albright instructed me that Mr. Sutton could not be removed and that we must allow the investigation being conducted by I&I to be completed prior to taking any action, precautionary or otherwise, against or with regard to Mr. Sutton.

*Defendant Correctional Medical System's Exhibit 2 (Affidavit of Colleen Oakes) - Court*

*Doc. No. 26-2* at 2.  After meeting with Oakes, Albright then consulted with Rainbow

Cross, the health Services administrator at Tutwiler, regarding the complaint lodged by

10

Dixon against nurse Sutton.  Cross details this meeting and the subsequent involvement of

CMS as follows:

> ... [O]n the afternoon of August 13, 2008, I was summoned to [the] office of Frank Albright, the warden of Tutwiler.  Prior to this meeting with Warden Albright, I had been notified by the Director of Nursing, Colleen Oakes, R.N., of a meeting that had occurred earlier that day ... during which Warden Albright informed Ms. Oakes that he had received a "sexual harassment" complaint by an inmate against James Sutton, a licensed practical nurse on staff at Tutwiler at that time....
>
> Upon arriving at the Warden's office on the afternoon of August 13, 2008, I was notified that Felicia Dixon ... had made an allegation that she had been sexually harassed by Mr. Sutton.  Warden Albright informed me that Ms. Dixon had alleged that Mr. Sutton had engaged in inappropriate discussions of a sexual nature with her, requested sex and touched her in an inappropriate fashion.  This was the very first occasion I had been notified of these allegations or any allegations of any kind with regard to any inappropriate conduct involving Mr. Sutton and anyone at Tutwiler, including inmates, medical staff and/or correctional staff.  During the course of our conversation, Warden Albright did not provide any more specific or detailed explanation of the allegations made by Ms. Dixon.  Warden Albright also informed me that he had notified representatives of I&I and that I&I was in the process of undertaking an investigation of the allegations by Ms. Dixon.  Warden Albright stated that I&I had utilized a concealed recording device placed on Ms. Dixon in an effort to elicit some inappropriate conduct by or communication from Mr. Sutton.  At the conclusion of the meeting, Warden Albright instructed me that I could not disclose the substance of our conversation to anyone beyond Ms. Oakes, myself, my supervisors and CMS's Legal and Human Resources Departments and/or take any action of any kind with regard to Mr. Sutton which would result in his removal from the facility.  During my conversation with Warden Albright, I asked whether Mr. Sutton would be immediately relieved of his duties at the facility as a preventative measure, but Warden Albright indicated that he was required to allow the I&I investigation to proceed prior to taking any further action of any kind.  As my conversation with Warden Albright concluded, he informed me that he would provide me with further instructions and/or information as to the status of the investigation by I&I later that evening.

On the evening of August 13, 2008, Warden Albright contacted me by telephone and informed me that the "wire" placed on Ms. Dixon did not result in any incriminating evidence supporting the allegations made by Ms. Dixon. Warden Albright also stated that I&I and/or members of the Tutwiler correctional staff intended to continue their investigative efforts in the following days, including an interview of Ms. Dixon and Mr. Sutton by I&I investigators, and that no affirmative action of any kind should be taken by CMS with regard to Mr. Sutton until I received further instructions from him.

I received another telephone call from Warden Albright on August 18, 2008. During our telephone conversation, Warden Albright stated that I&I had allegedly obtained evidence supporting the allegations asserted by Ms. Dixon. I also learned that Ms. Dixon had been transported to a separate facility, the Montgomery Women's Center in Mt. Meigs, Alabama in order to isolate her from Mr. Sutton. Warden Albright indicated that he was still in communication with I&I regarding the current status of the investigation and that he would be back in touch with me to update me on the status of the investigation and/or what, if any, steps they intended CMS to take with regard to Mr. Sutton.

On [or about] August 18, 2008, I reviewed Mr. Sutton's personnel record [contained in the record before this court] for any disciplinary history or prior occurrences of inappropriate conduct and did not see anything in his file indicating any history of such conduct.... As indicated in his personnel records, Mr. Sutton had received prior written warnings regarding his job performance, but there was no evidence of any kind in his personnel record that would support Ms. Dixon's complaints against him. Mr. Sutton's application ... does not contain any information which would provide any notice of [the type of] conduct alleged by Ms. Dixon. Additionally, his application includes the clear [directive by CMS] that "**Harassment in any form will not be tolerated in the work place.**"

When I had not received any definitive instructions from Warden Albright as of August 25, 2008, we instituted a formal investigation into the complaint made by Ms. Dixon at the direction of CMS's Human Resources Department. Because Ms. Dixon is an inmate, we were not able to question her about her allegations at any time and were required to rely exclusively upon the information provided by Warden Albright. Because of the instructions from Warden Albright and concerns regarding potentially interfering with the on-going I&I investigation, we did not interview Mr. Sutton out of concern that any such conduct might be construed as interfering

12

with the on-going investigation by I&I.   I assigned the primary responsibilities regarding this investigation to the Director of Nursing, Ms. Oakes, who reported the results of the investigation to me.  In short, the investigation did not reveal any evidence supporting in any way the allegations asserted by Ms. Dixon.

In reviewing Mr. Sutton's personnel records ..., I confirmed that, at the beginning of his employment with CMS, Mr. Sutton had received all of the policies and procedures promulgated by CMS with regard to the conduct of CMS employees.  In a form titled "Acknowledgement," Mr. Sutton acknowledged in writing his "receipt of the **January 2007** Correctional Medical Services (CMS) *Employee Success Guide*" on November 7, 2007, and agreed to familiarize himself with the contents of this Guide.  [This Guide explicitly prohibits harassment of any kind, including verbal, physical or sexual harassment, in the work place.  The Guide further clearly prohibits abuse of inmates in any manner.]

\* \* \*

In addition to receiving and acknowledging his receipt and understanding of the policies and procedures set forth in the Employee Success Guide, I also confirmed that Mr. Sutton had received training on November 7, 2007, and May 13, 2008, regarding CMS's "Harassment Awareness" curriculum.... [In submitting his employment application, [ Mr Sutton ... [acknowledged], "As a professional health care provider, conversations with inmates should ... [b]e limited to health care issues" and that patients should be treated with "dignity and respect."

In a memorandum from Warden Albright to Mr. Sutton dated September 30, 2008, Warden Albright notified Mr. Sutton that he was no longer "authorized to enter Tutwiler Prison for Women until further notice." ... The following day, October 1, 2008, I completed the necessary paperwork ... attached hereto which memorialize that [Sutton's] employment [with CMS] concluded due to the decision by the ADOC to revoke his security clearance necessary for his entry and employment at Tutwiler.

*Defendant Correctional Medical System's Exhibit 1 (Affidavit of Rainbow Cross) - Court*

*Doc. No. 26-1* at 1-9.[2]

---

[2]CMS and Sutton assert Dixon failed to properly exhaust the administrative remedy available to her at Tutwiler and these defendants seek dismissal of the claims against them for this failure.  However, the grievance

Dixon returned to Tutwiler on September 26, 2008 and correctional officials "placed [her] in segregation for protective custody for 5 days." *Plaintiff's Amendment to the Complaint - Court Doc. No. 31* at 6. On September 30, 2008, warden Albright notified Sutton his authorization to enter Tutwiler had been revoked due to the allegations made by Dixon. In light of the warden's action barring Sutton from Tutwiler, CMS terminated Sutton's employment. On October 1, 2008, Dixon "found out defendant Sutton was no longer employed through CMS at Tutwiler." *Id.* No criminal charges were lodged against Sutton as a result of the alleged sexual encounter with Dixon.

## B. Everest Indemnity Insurance Company

Dixon does not allege Everest acted in violation of her constitutional rights; instead, she seeks to have Everest held responsible for payment of any damages assessed against Sutton and/or CMS. Initially, the court concludes Dixon is due no relief from Everest

---

procedure appears to allow redress of claims arising from the medical treatment provided to inmates during their incarceration. ("Upon arriving [at a state correctional facility], inmates are notified of the procedures and processes for obtaining medical care and prescribed medications.... [I]nmates are provided a form entitled 'ACCESS TO HEALTHCARE SERVICES' [a form Dixon acknowledged receiving].... [I]nmates are well-aware of and utilize the grievance process ***to voice a complaint regarding any medical treatment sought or received during their incarceration at Tutwiler***." *Correctional Medical Services Exhibit 1 (Affidavit of Rainbow Cross) - Court Doc. No. 26-1* at 9 (emphasis added). Based on the provisions of the grievance procedure, Dixon "asserts ... there is 'no' known grievance process ... that would have any reference to sexual assault and assault and battery that is the bases of this claim." *Plaintiff's February 19, 2009 Response Court Doc. No. 50* at 3. Moreover, Dixon maintains her submission of a complaint against Sutton to correctional officials and their handling of this complaint to the exclusion of medical personnel constituted proper "exhaust[ion] of all remedies available to her." *Plaintiff's July 9, 2009 Response - Court Doc. No. 73* at 6 (emphasis in original). The court agrees with Dixon. Specifically, Dixon did not seek redress of medical treatment. Moreover, it is clear that upon her reporting the incident to correctional officials these officials began an investigation into the allegation against Sutton and explicitly precluded ***any*** action by medical personnel regarding the matter. The court therefore deems it appropriate to address the merits of Dixon's claims for relief against the medical defendants.

14

because she fails to present any claim against Everest with regard to this defendant taking

any action in violation of her constitutional rights.  In addition, there is no legal basis on

which Dixon can proceed against Everest as this entity is neither a person nor a state actor.

*American Manufacturers Mutual Ins. Company v. Sullivan*, 526 U.S. 40, 119 S.Ct. 977,

985, 143 L.Ed.2d 130 (1999) (an essential element of a 42 U.S.C. § 1983 action is that a

person acting under color of state law committed the asserted constitutional deprivation);

*Willis v. University Health Services, Inc.*, 993 F.2d 837, 840 (11ᵗʰ Cir. 1993) (same).

> To state a [viable] claim for relief in an action brought under § 1983, [a
> plaintiff] must establish that [she was] deprived of a right secured by the
> Constitution or laws of the United States, and that the alleged deprivation
> was committed under color of state law.... [T]he under-color-of-state-law
> element of § 1983 excludes from its reach "'merely private conduct, no
> matter how discriminatory or wrongful,'" *Blum v. Yaretsky*, 457 U.S. 991,
> 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (quoting *Shelley v. Kraemer*,
> 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)).... [Consequently,] state
> action requires ***both*** an alleged constitutional deprivation "caused by the
> exercise of some right or privilege created by the State or by a rule of
> conduct imposed by the State or by a person for whom the State is
> responsible," ***and*** that "the party charged with the deprivation must be a
> person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil
> Co.,* 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); *see Flagg
> Bros., Inc. v. Brooks,* 436 U.S. 149, 156, 98 S.Ct. 1729, 56 L.Ed.2d 185
> (1978)."

*American Manufacturers*, 526 U.S. at 49-50, 119 S.Ct. at 985 (footnote omitted) (emphasis

in original).  Finally, by its explicit terms, the insurance policy issued by Everest to CMS

"does not apply ... [t]o any liability of an insured resulting from actual or alleged sexual

intimacy, sexual molestation, sexual harassment, sexual exploitation, or sexual assault of

any kind...."  *Defendant Everest's Exhibit 1 to the Special Report - Court Doc. No. 54-1*

at 9-10.  Thus, Everest is entitled to summary judgment.  The court will henceforth address

the plaintiff's claims against the remaining defendants as they are state actors subject to

suit  in this 42 U.S.C. § 1983 cause of action.

## C.  Absolute Immunity

With respect to claims lodged against defendants Sutton, CMS and Allen in their

official capacities, they are immune from monetary damages.  Official capacity lawsuits are

"in all respects other than name, ... treated as a suit against the entity."  *Kentucky v.*

*Graham*, 473 U. S. 159, 166 (1985).  "A state official may not be sued in his official

capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst*

*State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d

67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*,

[517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived

its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th

Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.

Therefore, Alabama state officials are immune from claims brought against them in their

official capacities."  *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear to the court that defendants Sutton, CMS and

Allen are state officials entitled to sovereign immunity under the Eleventh Amendment for

all claims seeking monetary damages from them in their official capacities. *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994). Thus, these defendants are entitled to absolute immunity from any claims for monetary relief presented against them in their official capacities. *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

### D.  Equal Protection

Dixon makes the conclusory allegation that the defendants violated her "federally protected right of ... equal protection" with respect to the actions about which she complains. *Plaintiff's Amendment to the Complaint - Court Doc. No. 31* at 3.

To establish a claim cognizable under the Equal Protection Clause, "a prisoner must [at a minimum] demonstrate that (1) [she] is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against [her] based on race, religion, national origin, or some other constitutionally protected basis. *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)." *Sweet v. Secretary, Department of Corrections*, 467 F.3d 1311, 1318-1319 (11th Cir. 2006). "[O]fficial action will not be held unconstitutional solely because it results in a ... disproportionate impact.... Proof of ... discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development*

17

*Corp.*, 429 U.S. 252, 264-265 (1977).  "'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences.  It implies that the decision maker ... selected ... a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991).  Evidence which merely indicates disparity of treatment or even arbitrary administration of state powers, rather than instances of purposeful or invidious discrimination, is insufficient to show discriminatory intent. *McKleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Initially, the court notes Dixon fails to identify any similarly situated inmate nor does she allege how the defendants acted in a more favorable manner towards any other inmate.  Thus, "[Dixon's] equal protection claim necessarily fails first because [she] has not shown that [she] was treated differently from other, similarly situated prisoners." *Sweet*, 467 F.3d at 1319.  Additionally, Dixon completely fails to meet her pleading burden as she does not allege that the defendants subjected her to adverse treatment based on some constitutionally impermissible reason; rather, she simply makes the conclusory assertion that the defendants violated her right to equal protection.  Beyond this self-serving and conclusory allegation, Dixon produces nothing which suggests that the defendants took any action against her based on a constitutionally protected interest.  In light of the foregoing,

18

the court concludes that Dixon's mere conclusory assertion does not rise to the level of an equal protection violation and therefore provides no basis for relief in this 42 U.S.C. § 1983 action.  Consequently, the defendants are entitled to summary judgment on this claim.

### E.  Respondeat Superior - Richard Allen and CMS

It is clear from a review of the complaint that defendant Allen is sued solely due to his former position as Commissioner of the Alabama Department of Corrections. Specifically, Dixon maintains defendant Allen should be held liable for the actions of nurse Sutton because he entered into the contract allowing CMS to provide medical treatment to inmates.  *Plaintiff's Amendment to the Complaint - Court Doc. No. 31* at 8. Dixon also seeks to hold CMS liable for the actions of nurse Sutton due to his serving as its employee at the time of the claims made the basis of this complaint.

The law is well settled that a defendant "can have no respondeat superior [or vicarious] liability for a section 1983 claim."  *Marsh v. Butler County*, 268 F.3d 1014, 1035 (11th Cir. 2001); *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004) ("[S]upervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability."); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir.2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th

Cir. 1999), citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of their subordinates under either a theory of respondeat superior or vicarious liability.); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1115-1116 (11th Cir. 2005) (In establishing liability under § 1983, a prisoner cannot rely on theories of vicarious liability or respondeat superior.).  Thus, defendants Allen and CMS can be held liable for the challenged actions of nurse Sutton only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [their] actions ... and the alleged constitutional deprivation[s]."  *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citation omitted).

It is undisputed defendants Allen and CMS did not personally participate in the sexual encounter about which Dixon complains.  Based on the foregoing, these defendants may be held liable in this 42 U.S.C. § 1983 action only if their actions bear a causal relationship to the purported violations of Dixon's constitutional rights.  To establish the requisite causal connection and therefore avoid entry of summary judgment in favor of these defendants, Dixon must present sufficient evidence of either "a history of widespread abuse [that] put[] [Allen] on notice of the need to correct the alleged deprivation, and [the defendants] fail[ed] to do so...." or "a ... custom or policy [that] result[ed] in deliberate indifference to constitutional rights, or ... facts [that] support an inference that [Allen]

20

directed the subordinates to act unlawfully, or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Cottone*, 326 F.3d at 1360 (internal punctuation and citations omitted).  This standard of supervisory liability "is extremely rigorous."  *Gonzalez*, 325 F.3d at 1234.  A thorough review of the pleadings and evidentiary materials submitted in this case demonstrates Dixon has failed to meet this burden.

The record before the court contains no evidence to support an inference that Allen or CMS directed nurse Sutton to act unlawfully or knew this individual would act unlawfully and failed to stop such action nor can the court countenance the existence of any such evidence.  Dixon has likewise presented no evidence indicating a history of widespread abuse by Sutton or any other medical care provider at Tutwiler which put Allen or CMS on requisite notice of incidents of sexual abuse against inmates.  Consequently, neither method of establishing supervisory liability under the causal relationship test provides a basis for liability under § 1983.  In addition, as previously noted, the record is devoid of evidence that a custom, policy or practice of the Alabama Department of Corrections or CMS resulted in the alleged violations of Dixon's constitutional rights.  *Cf. Employment Div. v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990); *Turner v. Safely,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).  Summary judgment is therefore due to be granted in favor of defendants Allen and CMS.

### F.  Deliberate Indifference to Safety - Failure to Protect
### Correctional Medical Services

Dixon argues CMS acted with deliberate indifference to her safety in hiring, training and supervising nurse Sutton.  *Plaintiff's Amendment to the Complaint - Court Doc. No. 31* at 8.  In support of this claim, Dixon argues the policies, practices and procedures of this defendant resulted in the hiring of Sutton and allowed Sutton to act in ways which violated her constitutional rights.  *Id.*  Dixon further maintains "Sutton should have been placed on some type of reduced/supervised employment or fired from his position after plaintiff reported his conduct [on July 25, 2008]."  *Id*.  However, Dixon concedes the only incident of misconduct by Sutton occurred in June of 2008.  CMS adamantly denies it acted with deliberate indifference to Dixon's safety.

A responsible official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's safety when the official knows the inmate faces "a substantial risk of serious harm" and with such knowledge disregards the risk by failing to take reasonable measures to abate it.  *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  A constitutional violation occurs only "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[] reasonably to the risk.'  *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1982-83, 128 L.Ed.2d 811 (1994).  A plaintiff must also show that the constitutional violation caused [her] injuries."  *Marsh*, 268 F.3d at  1028.

22

The law is well settled that both objective and subjective elements are necessary to establish an Eighth Amendment violation.  With respect to the requisite objective elements of a deliberate indifference claim, an inmate must first show "an objectively substantial risk of serious harm ... exist[ed].  Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d 1028-1029.  As to the subjective elements, "the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference....  The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'  ... *[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment*."  *Farmer*, 511 U.S. at 837-838 (emphasis added); *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety....  It is *obduracy and wantonness, not inadvertence or error in good faith*, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or

23

restoring official control over a tumultuous cellblock." *Whitley v. Albers*, 475 U.S. 312,

319 (1986) (emphasis added).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991)....  Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  "The known risk of injury must

be a strong likelihood, rather than a mere possibility before a [correctional official's]

failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533,

1537 (11th Cir. 1990) (citations and internal quotations omitted).  As the foregoing makes

clear, "[m]erely negligent failure to protect an inmate ... does not justify liability under

section 1983...." *Id*.

Pursuant to the aforementioned criteria, Dixon is "required to produce sufficient

evidence of (1) a substantial risk of serious harm; (2) the defendant['s] deliberate

indifference to that risk; and (3) causation[]" in order to survive summary judgment on her

deliberate indifference claim against the supervisory officials.  *Hale v. Tallapoosa County*,

50 F.3d 1579, 1582 (11th Cir. 1995); *Farmer*, 511 U.S. at 837-838 (To circumvent entry of

summary judgment on a properly supported motion, plaintiff must produce sufficient

evidence which demonstrates (1) an objectively substantial risk of serious harm; (2) a subjective awareness of this risk on the part of the defendant; (3) the defendant responded to such risk in an objectively unreasonable manner; and (4) the actions/omissions of the defendant caused her injuries); *Marsh*, 268 F.3d at 1028-1029 (same).  Thus, it is clear an official responsible for an inmate's safety cannot be liable for a risk which he is unaware. *Farmer*, 511 U.S. at 837.  The official may likewise escape liability if he shows he did not know of the obvious risk to an inmate's safety, or even if knowing it, acted reasonably under the circumstances. *Id*. at 844-845.

The record is completely devoid of evidence that the incident with nurse Sutton occurred due to deliberate indifference on the part of CMS.  Initially, there is nothing before the court to indicate "the known risk of injury [was] a strong likelihood, rather than a mere possibility...." *Brown*, 894 F.2d at 1537.  Moreover, the evidence before the court indicates CMS enacted policies and procedures to prevent any sort of harassment or physical abuse of inmates by its employees.  In addition, at the time of the alleged sexual encounter, CMS personnel had no knowledge of any prior abuse of inmates by Sutton as, to their knowledge, Sutton had never been accused of such misconduct.  Furthermore, there is no evidence to suggest that once CMS became aware of the incident it acted with deliberate indifference to Dixon's safety.  It is undisputed that upon notification of the incident with Sutton correctional officials, with the assistance of Dixon, began a thorough

25

investigation of the allegation made against Sutton.  Pursuant to explicit instructions from the warden, CMS did not interfere with this investigation.  On August 13, 2008, approximately two weeks after Dixon advised correctional officials of the alleged sexual encounter with Sutton and after completion of Dixon's role in the investigation, the warden transferred Dixon to a separate correctional facility where she had no contact with Sutton.  Upon her return to Tutwiler on September 26, 2008, correctional officials placed Dixon in protective custody to limit potential contact with Sutton.  On September 30, 2008, the warden withdrew Sutton's security clearance to Tutwiler which resulted in the termination of his employment with CMS.  Dixon was then released from protective custody.

Dixon presents no evidence of an objectively substantial risk of serious harm either at the time of the challenged incident or thereafter nor is there any evidence demonstrating subjective awareness of a substantial risk of such harm by CMS, each of which is a required element of the instant Eighth Amendment claim.  *Carter*, 352 F.3d at 1350 ("Plaintiff has failed to establish that [CMS] had a subjective awareness of a substantial risk of serious physical [harm] to Plaintiff; thus, Plaintiff has failed to establish a required element of this claim.  When viewing the evidence most favorably toward Plaintiff, a claim for deliberate indifference has not been established....").  Furthermore, the response of CMS once informed of Dixon's allegations by the warden - (i) allowing correctional officials to conduct an investigation into the allegations and provide protection to Dixon,

including her transfer to a different institution and placement in protective custody while at Tutwiler, (ii) performing its own investigation into the matter, and (iii) terminating Sutton's employment in accordance with the directives of correctional officials - was clearly objectively reasonable.  To accept Dixon's underlying premise, i.e., no response to her claims would be reasonable unless the response immediately divested Sutton of all or a majority of his duties, is not acceptable because "to do so would empower any prisoner at any time to dictate prison staffing [by simply making allegations against staff members]. Penological interests must factor into the calculus of reasonable responses.  *See Chandler v. Crosby*, 379 f.3d 1278, 1290 (11th Cir. 2004) ('As judges, we lack carte blanche to impose our own theories of penology on the nation's prisons.'  (Internal citation and quotation omitted.))."  *Doe v. Georgia Dept. of Corrections, et al.*, 248 Fed.Appx. 67, 71 (11th Cir. 2007).   Finally, the objective evidentiary materials submitted by CMS demonstrate the action about which Dixon complains did not occur pursuant to any policy enacted by CMS; rather, the evidence establishes that applicable policies expressly prohibited the behavior made the basis of this complaint.  Consequently, summary judgment is due to be granted in favor of CMS on any claim of deliberate indifference arising from the alleged sexual encounter with Sutton in June of 2008.

### G.  Violation of the Eighth Amendment

Dixon maintains Sutton violated her Eighth Amendment right to be free from sexual

abuse while incarcerated.[3]   The Eleventh Circuit recognizes that "[s]evere or repetitive

sexual abuse of a prisoner by a prison official can violate the Eighth Amendment." *Boxer*

*X v. Harris*, 437 F.3d 1107, 1111 (11th Cir. 2006); *Boddie v. Schnieder*, 105 F.3d 857, 860-

861 (acknowledging sexual abuse of prisoner by state actor may, in some circumstances,

violate prisoner's Eighth Amendment right to be free from cruel and unusual punishment);

*Freitas v. Ault*, 109 f.3d 1335, 1338 (8th Cir. 1997) ("[P]risoners can state a cause of action

for sexual harassment under 42 U.S.C. § 1983.").

With respect to claims arising during an inmate's incarceration, state officials

violate the Eighth Amendment through "the unnecessary and wanton infliction of pain."

*Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 1974 (1994); *Chandler v. Crosby*,

379 F.3d 1278, 1289 (11th Cir. 2004).   "No static 'test' exist[s] ... by which courts

determine whether conditions of confinement are cruel and unusual, for the Eighth

Amendment 'must draw its meaning from the evolving standards of decency that mark the

---

[3]Although an action filed by an inmate under 42 U.S.C. § 1983, asserting sexual assault or other related claims, is properly an action alleging a violation of the Eighth Amendment, Dixon seeks to also invoke the substantive protections of due process contained in the Fourteenth Amendment.  However, with respect to the claims presented in the instant complaint, the law is well settled that the Fourteenth Amendment provides no greater protection to a state inmate than does the Eighth Amendment.  *Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078,  1088 (1986) ("[T]he Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners in cases such as this one.... [I]n [cases involving the protection of state inmates] the Due Process Clause affords [plaintiff] no greater protection than the Cruel and Unusual Punishments Clause."); *Graham v. Connor*, 490 U.S. 386, 395 n.10, 109 S.Ct. 1865, 1871 n.10 (1989) ("Any protection that 'substantive due process' affords convicted prisoners against [assault] is, ... at best redundant of that provided by the Eighth Amendment."); *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir. 1987) ("[T]he Due Process Clause affords a convicted prisoner no greater protection than the Cruel and Unusual Punishments Clause.... ").   Thus, this court will analyze Dixon's sexual assault claim solely under the Eighth Amendment.

progress of a maturing society.'" *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392,

2399 (1981) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598 (1958).  The

standard applied to an Eighth Amendment claim contains both a subjective and objective

component.  *Wilson*, 501 U.S. at 298, 111 S.Ct. at 2324; *Farmer*, 511 U.S. at 834, 114

S.Ct. at 1977.  "[A] prison  official violates the Eighth Amendment only when" both

components are met.  *Id*.  When conducting this analysis, what constitutes "unnecessary

and wanton infliction of pain" violative of the Eighth Amendment will vary depending on

the nature of the alleged constitutional violation.  *Hudson*, 503 U.S. at 8, 112 S.Ct. at 999.

The subjective component requires that prison "officials act[ed] with a sufficiently culpable

state of mind." *Id*. (internal quotations omitted).  With respect to the objective component,

a plaintiff must show that "the alleged wrongdoing was objectively harmful enough to

establish a constitutional violation."  *Id*.

Dixon maintains Sutton required her to perform oral sex on him in violation of her

constitutional rights.  Sutton denies the allegations made against him by Dixon.  *Defendant*

*Sutton's Exhibit 1 - Court Doc. No. 66-1* at 4 ("I have never provided Ms. Dixon with food

or use of the telephone....  I have never had a sexual encounter with Ms. Dixon.").  Sutton

further contends, assuming *arguendo* the act did occur as described by Dixon, it was

consensual, and, therefore, did not result in the type of injury prohibited by the Eighth

Amendment.  Dixon challenges Sutton's characterization of her compliance as consensual

and argues she did not voluntarily engage in the sexual act.

Viewing the facts in the light most favorable to Dixon, as is required at this stage of the proceedings, the court concludes the plaintiff has alleged facts sufficient to survive defendant Sutton's motion for summary judgment regarding the sexual abuse claim.  If an inmate is forced to perform oral sex, it is objectively harmful.[4]   In addition, a medical official employed by the prison system "who sexually abuses a prisoner can be found to have a sufficiently culpable state of mind to violate the prisoner's constitutional rights." *Boddie*, 105 F.3d at 861.  Disputed issues of material fact exist regarding whether the sexual act occurred, whether Dixon consented to the act and whether Sutton acted with a sufficiently culpable state of mind.  Consequently, the motion for summary judgment filed by Sutton in his individual capacity is due to be denied. The court likewise concludes that Sutton, at this stage of the proceedings, is not entitled to summary judgment on the plaintiff's state tort claims, i.e., assault, battery and negligence, presented against him in his personal capacity.

### H.  Supplemental Jurisdiction - State Tort Claims Against Allen and CMS

---

[4]In recognizing severe acts of sexual abuse by state officials against inmates can violate the Eighth Amendment, the *Boxer X* Court held that "an injury can be 'objectively, sufficiently serious [as required to establish a constitutional violation] only if there is more than a *de minimis* injury."  437 F.3d at 1111 (citing *Johnson v. Breeden*, 280 F.3d 1308, 1321 (11th Cir. 2002).  *Johnson* involved an excessive force claim under the Eighth Amendment and the *de minimis* injury proposition set forth therein has been overruled as the *de minimis* nature of an inmate's injuries is not dispositive of an Eighth Amendment claim.  *Wilkins v. Gaddy*, ____ U.S. ____, 130 S.Ct.1175, 1177 (2010) (Dismissal of "a prisoner's excessive force claim based entirely on ... [a] determination that his injuries were '*de minimis*' [is improper] ... [as it] is at odds with *Hudson's* direction to decide excessive force claims based on the nature of the force rather than the extent of the injury....").

With respect to the pendent state law claims for assault/battery and negligence lodged against Richard Allen and CMS, the court concludes these claims provide no basis for relief in this cause of action.  Review of any pendent state law claim is only appropriate upon exercise of this court's supplemental jurisdiction.  In the posture of this case, however, the court deems the exercise of such jurisdiction over state tort claims against defendants Allen and CMS inappropriate.

> Two factors determine whether state law claims lacking an independent federal jurisdictional basis can be heard in federal court with a federal claim over which the court has jurisdiction.  To exercise pendent jurisdiction [or what is now identified as supplemental jurisdiction] over state law claims not otherwise cognizable in federal court, "the court must have jurisdiction over a substantial federal claim and the federal and state claims must derive from a 'common nucleus of operative fact.'"  *Jackson v. Stinchcomb,* 635 F.2d 462, 470 (5th Cir.1981) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)).  *See generally* C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 3567 pp. 443-47 (1975).

*L.A. Draper and Son v. Wheelabrator Frye, Inc.*, 735 F.2d 414, 427 (11th Cir. 1984).  The exercise of supplemental jurisdiction is completely discretionary.  *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).  "If the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state claims."  *L.A. Draper and Son*, 735 F.2d at 428.  In view of the resolution of the federal claims presented by Dixon against defendants Allen and CMS, the court concludes any pendent state claims against these defendants are due to be dismissed.  *Gibbs*, 383 U.S. at 726 (if the federal claims are

31

dismissed prior to trial, the state claims should be dismissed as well); *see also Ray v. Tennessee Valley Authority*, 677 F.2d 818 (11th Cir. 1982).  The court therefore declines to exercise supplemental jurisdiction over the pendent state tort claims presented against defendants Allen and CMS.

A separate order will accompany this memorandum opinion.

Done this 9th  day of May, 2011.


           /s/   Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE